United States District Court
Eastern District of New York

----------------------------------X

Christopher Oji,

               Plaintiff,            **Memorandum and Order**

   - against -              No. 22-cv-276 (KAM) (CLP)

Douglas A. Collins, Secretary,
Department of Veterans Affairs,

               Defendant.

----------------------------------X

**Kiyo A. Matsumoto, United States District Judge:**

     On January 18, 2022, Plaintiff Christopher Oji ("Plaintiff" or "Oji") initiated this action against the Secretary of the United States Department of Veterans Affairs (the "VA"), Douglas A. Collins[1] ("Defendant" or "Collins"), alleging fourteen causes of action pursuant to the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981"), Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII"), New York State Human Rights Law, N.Y. Exec. Law § 290, *et seq.* ("NYSHRL"), and New York City Human Rights Law, N.Y.C. Admin Code §§ 8-101, *et seq.* ("NYCHRL"). (ECF No. 1, Compl.)  On August 21, 2024, Plaintiff filed an Amended

---

[1] Plaintiff initially named then Secretary of the VA Denis Richard McDonough as the Defendant in his January 18, 2022 Complaint.  As the Secretary of the United States Department of Veterans Affairs is a public official, the current Secretary, Mr. Collins, is automatically substituted for Mr. McDonough.  *See* Fed. R. Civ. P. 25(d).  The Clerk of Court is respectfully directed to update the caption of this case to reflect this substitution.

Complaint against Mr. Collins alleging seven causes of action pursuant only to Section 1981 and Title VII, seeking a declaratory judgment and damages to address injuries Plaintiff allegedly suffered due to racial and/or national origin discrimination, retaliation, and hostile work environment. (ECF No. 42, "Am. Compl.")

Presently before the Court is Defendant's motion for summary judgment as to all of Plaintiff's claims. (*See* ECF No. 50, "Not. of Mot."; ECF No. 51, "Def. Mot.") For the reasons set forth below, Defendant's motion for summary judgment is GRANTED.

<u>**BACKGROUND**</u>

## I. Procedural Background

On August 19, 2019, Plaintiff filed a Verified Administrative Complaint with the United States Equal Employment Opportunity Commission ("EEOC") alleging discrimination based on race and national origin. (ECF No. 1-1, Final Agency Decision at 1[2].) On October 21, 2021, the EEOC issued a Final Agency Decision, which concluded that Plaintiff "failed to establish by a preponderance of the evidence that he was discriminated against or subjected to hostile environment harassment based on national origin, race, or reprisal" and granted Plaintiff the right to file a civil action. (ECF No. 1-1, Final Agency Decision at 25-26.) Plaintiff commenced

---

[2] All pin citations to the record refer to the page number assigned by the court's CM/ECF system.

the instant action on January 18, 2022 by filing a complaint in federal court. (ECF No. 1, Compl.)

On January 29, 2024, after the close of discovery, Defendant moved for a pre-motion conference to discuss their anticipated motion for summary judgment, attaching a Local Rule 56.1 Statement of Material Facts. (*See* ECF No. 23, Def. Mot. for Pre-Motion Conf. & 56.1 Stmt.) After several motions for an extension of time to file a reply, Plaintiff filed his opposition on April 13 and 16, 2024 and Defendant filed a reply 56.1 Statement on May 3, 2024. (*See* ECF Nos. 28-31, Pl. Opp.; ECF Nos. 34-35, Def. Reply.)

The Court held a pre-motion conference on August 1, 2024 to discuss Defendant's anticipated motion for summary judgment. Following the conference, Plaintiff filed an Amended Complaint, and Defendant filed a response on September 4, 2024. (*See* ECF No. 42, "Am. Compl."; ECF No. 43, Def. Answer.) Thereafter, the Parties proceeded to summary judgment briefing and the Court now considers Defendant's fully briefed motion for summary judgment.

## II. Factual Background

Based on the Parties' Local Rule 56.1 Statements, declarations, and exhibits, the Court has construed the facts in a manner favorable to the non-moving Plaintiff and finds that the following material facts are not in genuine dispute.[3]

---

[3] Local Civil Rule 56.1 provides that a party moving for summary judgment "shall annex[ ] to the notice of motion a separate, short and concise statement," "of the material facts to which the moving party contends there is no genuine issue

The United States Department of Veteran Affairs (the "VA") is an agency of the executive branch of the federal government. (ECF No. 55, Consolidated Statement of Material Facts, "Def. 56.1 Statement," ¶ 1.) The VA Engineering Service is comprised of five sections: "energy, safety, environmental, maintenance and repair, and planning and design." (Def. 56.1 Statement ¶ 4.) The employees of each section of the Engineering Service "report to a supervisor, called 'chief,'" who reports to a "deputy chief engineer," who in turn reports to the "Chief of the Engineering Service." (Def. 56.1 Statement ¶ 5.)

---

to be tried." Local Civ. R. 56.1(a). The party opposing the motion must "include a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party" with the opposition. Local Civ. R. 56.1(b). Each of these paragraphs must cite to admissible evidence. Local Civ. R. 56.1(d); *see also Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir. 2003) ("[A] Local Rule 56.1 statement is not itself a vehicle for making factual assertions that are otherwise unsupported in the record.").

Here, Plaintiff "improperly interjects arguments and/or immaterial facts in response to facts asserted by Defendant, without specifically controverting those facts" in the majority of his responses. *Risco v. McHugh*, 868 F. Supp. 2d 75, 86 n.2 (S.D.N.Y. 2012); (*see, e.g.*, Def. 56.1 Statement ¶¶ 10, 11, 12, 15, 16, 17, 18, 19, 33, 40, 41, 70, 85, 93, 99, 105, 116, 117, 118, 133, 135, 136.) These statements will be disregarded. *Costello v. N.Y. State Nurses Ass'n*, 783 F. Supp. 2d 656, 661 n.5 (S.D.N.Y. 2011) (disregarding plaintiff's responses to defendant's Rule 56.1 Statement where plaintiff responded with conclusory assertions or legal arguments).

Moreover, Plaintiff's "[r]esponses . . . which do not point to any evidence in the record that may create a genuine issue of material fact, do not function as denials, and will be deemed admissions of the stated fact." *Senno v. Elmsford Union Free Sch. Dist.*, 812 F. Supp. 2d 454, 458 n.1 (S.D.N.Y. 2011); (*see, e.g.*, ¶¶ 6, 7, 20, 21, 40, 41, 54, 55, 56, 57, 71, 72, 75, 76, 77, 78, 79, 88, 89, 99, 109, 110, 114, 115, 119, 120, 137, 139.) Facts that were not contradicted by citations to admissible evidence are also deemed admitted. *See Ferraro v. New York City Dep't of Ed.,* 404 F. Supp. 3d 691, 698 (E.D.N.Y. 2017), *aff'd,* 752 F. App'x 70 (2d Cir. 2018)(*citing Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir. 2003) ("If the opposing party ... fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted.").)

Plaintiff, who identifies as African American and Nigerian American, was employed as a probationary employee as a "General Engineer, GS-12, for the Planning and Design Section of the [VA] Engineering Service at the Brooklyn VA Medical Center," from February 3, 2019 to August 16, 2019. (Def. 56.1 Statement ¶¶ 3, 34, 36, 38, 139.) The Brooklyn VA Medical Center is located at 800 Poly Place, Brooklyn, New York and "serves as a women's hospital, and other supporting facilities, compris[ed] of an out-patient clinic, engineering building, information technology support building, and a quarters building". (Def. 56.1 Statement ¶ 3.) During Plaintiff's employment, the Engineering Service included five General Engineers who self-reported the following national origins: "one Nigerian (Plaintiff), two Unknown, one Vietnamese, and one Israeli," and the following races: "three Black (including Plaintiff), one Asian, and one white." (Def. 56.1 Statement ¶¶ 6-7.)

Sam Fares, Chief of the Engineering Service, Philip Civello, Chief of Planning and Design, and Llan Fouks, Assistant Chief Engineer, interviewed Plaintiff for the General Engineer role. (Def. 56.1 Statement ¶ 32.) Ultimately, as the Chief of the Engineering Service, Mr. Fares made the decision to hire Plaintiff. (Def. 56.1 Statement ¶ 33.) While employed at the VA, Mr. Civello was Plaintiff's direct supervisor. (Def. 56.1 Statement ¶ 35.)

Plaintiff's employment with the VA Engineering Service became

effective on February 3, 2019 as a "career-conditional appointment" subject to a one-year probationary period. (Def. 56.1 Statement ¶¶ 38-39.) During the probationary period, VA supervisors "are required to study an employee's potential closely to determine whether s/he is suited for successful government work [and, w]hen it becomes apparent that an employee's conduct, general character traits or capacity do not meet the requirements for satisfactory service, the supervisor is required to initiate action to separate the employee." (Def. 56.1 Statement ¶¶ 40, 139; ECF No. 53-4, Def. Ex. 4, Termination Letter dated Aug. 13, 2019.)

### A. The VA's Policies Regarding Discrimination, Harassment, and Retaliation

The VA maintains an "Equal Employment Opportunity [("EEO")], Diversity and Inclusion, No FEAR, and Whistleblower Rights and Protection Policy Statement" (the "EEO Policy Statement") that applies to all VA employees. (Def. 56.1 Statement ¶ 9.) The VA posts EEO-related policies at its facilities and provides all EEO policies, including the EEO Policy Statement, to all employees at the start of their employment. (Def. 56.1 Statement ¶¶ 18-19.) The EEO Policy Statement prohibits all "unlawful discrimination, including workplace harassment, based on [among other things] race, color, religion, [and] national origin . . . or retaliation for opposing discriminatory practices or participating in the

6

discrimination-complaint process." (Def. 56.1 Statement ¶¶ 10-11; ECF No. 53-19, Def. Ex. 19 at 31.)  The EEO Policy Statement also includes avenues for reporting concerns of discrimination, harassment, and retaliation.  (Def. 56.1 Statement ¶ 12.)

The EEO Policy Statement advises employees that to file an EEO complaint under 29 CFR § 1614 they "*must* contact the Office of Resolution Management ("ORM") within 45 calendar days" of the most recent incident of alleged discrimination or retaliation.  (Def. 56.1 Statement ¶ 15; ECF No. 53-19, Def. Ex. 19 at 2 (emphasis added), 33 ("Employees and applicants for employment seeking redress under the EEO complaint process must contact an EEO counselor in VA's ORM in person, by phone, in writing within 45 calendar days of the date of the alleged discriminatory event.").)  As of March 16, 2016, employees could initiate contact with the VA's ORM 24 hours a day and 7 days a week.  (Def. 56.1 Statement ¶ 16.)  The EEO Policy Statement further advises employees that contacting the VA's local New York Harbor Healthcare System ("NYHHS") EEO office "does not constitute an initial contact for complaint processing purposes."  (Def. 56.1 Statement ¶ 17; ECF No. 53-19, Def. Ex. 19 at 2.)

Plaintiff completed three EEO training courses after joining the VA and the VA requires all employees to take mandatory Prevention of Workplace Harassment Awareness and No FEAR Act training in the Talent Management System at the start of their

employment, and every two years thereafter.  (Def. 56.1 Statement ¶¶ 20-21.)

### 1.  VA Employees' Statements to Plaintiff

Near the start of Plaintiff's employment at the VA, one of Plaintiff's co-workers, Khai Ha, who identifies as Vietnamese, informed Plaintiff of an experience Mr. Ha had in high school in which he was bullied by African Americans and which, as a result, affected Mr. Ha's view of African Americans.  (Def. 56.1 Statement ¶¶ 87, 91.)  Plaintiff did not report this comment to a supervisor, nor did Mr. Ha make any "discriminatory comments as to Plaintiff's race in the presence of a supervisor."[4]  (Def. 56.1 Statement ¶¶ 88-89.)  On May 26, 2019, Plaintiff sent Mr. Fares and Mr. Civello an email detailing Mr. Ha's behavior towards Plaintiff, including Mr. Ha's comment that Plaintiff should have been hired as a GS level 5 employee—a lower grade employee—rather than a GS level 12 employee, Mr. Ha's refusal to answer Plaintiff's

---

[4] Plaintiff responds to these facts as follows: "plaintiff states that he complained about Khai Ha's discriminatory treatment of him, in writing, including his statement that he should have been hired as a GS 5, and not follow instructions given to him by his supervisor, among other things, in an email dated May 26, 2019, to Civello and Sam Fares in response to which Fares told him to forget about being trained."  (Def. 56.1 Statement ¶¶ 88-89, Pl. Response.)  Although there is no dispute that Plaintiff sent an email to Mr. Fares and Mr. Civello on May 26, 2019, detailing Mr. Ha's behavior towards Plaintiff, Plaintiff's response does not create a material dispute of fact as to whether Plaintiff reported Mr. Ha's comment regarding Mr. Ha's experience with African Americans in high school to a supervisor or whether Mr. Ha made any discriminatory comments as to Plaintiff's race in the presence of a supervisor.  Accordingly, these facts are deemed admitted for the purposes of this motion.  *See Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73-74 (2d Cir. 2001) (emphasis added) (collecting cases) ("[W]here the cited materials do not support the factual assertions in the Statements, the Court is free to disregard the assertion.'").

questions, the fact that Mr. Ha discouraged Plaintiff from seeking training or following certain instructions, such as adding Plaintiff's signature to emails, and Mr. Ha saying he does not give an "F" about Plaintiff in the presence of Mr. Fares and Mr. Civello. (ECF No. 63-1, Ofodile Ex. 5 at 3.)

In another conversation on July 11 or 12, 2019, Plaintiff asked Mr. Fares about his national origin, Mr. Fares informed Plaintiff he was born in Egypt, and Plaintiff responded, "My African Brother." (ECF No. 55, Consolidated Statement of Material Facts, "Pl. 56.1 Counterstatement" ¶ 30, Def. Response; ECF No. 65-10, Pl. Oji Ex. 10 at 3.)

## B. Plaintiff's Job Responsibilities and Events Leading up to his Termination

As noted above, Plaintiff was employed as a probationary "General Engineer, GS [level] 12, for the Planning and Design Section of the [VA] Engineering Service at the Brooklyn VA Medical Center." (Def. 56.1 Statement ¶ 34.) The General Engineer job description summarizes Plaintiff's position and job duties as follows:

> Leads and directs cross-functional teams to deliver Department of Veterans Affairs (VA) construction projects within the constraints of schedule, budget and scope. Responsible for coordination and oversight of all activities relating to multiple concurrent architectural/engineering design efforts and construction endeavors. Serve as the designer/consultant in the planning, design and supervision of new construction, as well as alterations and additions to the existing building,

grounds, utility plants and systems.
(Def. 56.1 Statement ¶¶ 42-43.) The General Engineer job description also included a detailed description of the design and constructions phases, as well as a General Engineer's ancillary responsibilities as a Contracting Officer's Representative ("COR"). (Def. 56.1 Statement ¶¶ 44-46.) During the "design phase," a General Engineer is expected to, among other things, create a statement of work ("SOW"), prepare, design, and plan specifications and cost estimates for projects, review project submittals, and select, lead, and direct an Architectural and Engineering ("A/E") firm throughout the design process. (Def. 56.1 Statement ¶ 44.) During the "construction phrase," the General Engineer "leads site management staff in day-to-day project management," monitors and controls budgets, and prepares program metrics, among other responsibilities set forth in the General Engineer job description. (Def. 56.1 Statement ¶ 45.) A General Engineer is also expected to serve as a COR, which includes administering and approving contracts related to building services, design projects, and construction projects, anticipating and resolving project-related problems, developing "contingency plans to mitigate unresolved problems," and assisting in developing long range planning for various programs. (Def. 56.1 Statement ¶ 46.)

During the interview process, Plaintiff answered nineteen

10

questions regarding his experience and competency to perform the role of General Engineer, including whether Plaintiff was "[f]amiliar with reviewing and commenting on contract plans," "[k]nowledgeable of cost estimates for engineering, technical trades and industrial work in order to develop statements of work and costs estimates for construction, renovation, repair and maintenance work completed," and whether he could "[r]eview[] project submittal and shop drawings, analyze equipment requirements while providing estimates on labor and material costs." (Def. 56.1 Statement ¶¶ 48-56.) In response to these questions, Plaintiff certified either, "I have performed this task on the job. My work on this task was monitored closely by a supervisor or senior employee to ensure compliance with proper procedures" or "I have performed this task as a regular part of my job. I have performed it independently and normally without review by a supervisor or senior employee." (Def. 56.1 Statement ¶¶ 57, 48-56.)

Plaintiff's resume reflects that he obtained a Bachelor of Electrical Engineering degree from Auburn University and his prior work history including employment at Gannett Fleming as an Electrical Engineer, at Saturn Oil & Gas Consulting Firm where he worked on cost estimates, at Kupper Engineering where he performed power system analysis for hospitals, and at the New Jersey Department of Community Affairs as an Electrical Plan Reviewer.

11

(Pl. 56.1 Counterstatement ¶¶ 3-5, 8, 10.)  Mr. Fares interviewed approximately five applicants for the role of General Engineer, including Plaintiff, and asked each applicant numerous questions during the interview, which lasted approximately 45 minutes to one hour.  (Pl. 56.1 Counterstatement ¶ 14, Def. Resp.)    Defendant also conducted a background check, which involved checking Plaintiff's work history.  (Pl. 56.1 Counterstatement ¶ 13.)    Mr. Fares testified that he "believed at the time [of the interviews] that [Plaintiff] had the experience that [the VA was] looking for" based on Plaintiff's answers during his interview.  (Pl. 56.1 Counterstatement ¶ 14, Def. Resp.)

Although co-workers were not required to offer assistance to new employees, Plaintiff received mentorship from Kereem Vargas, a General Engineer in the Planning and Design Section.  (Def. 56.1 Statement ¶¶ 93, 95.)  Like Plaintiff, Mr. Vargas identifies as African American and has a background in electrical engineering. (Def. 56.1 Statement ¶¶ 96-97.)  Mr. Vargas took Plaintiff "under [his] wing" and "helped [Plaintiff] with his daily duties," "showed [Plaintiff] around," "allowed [Plaintiff] to shadow him," "showed [Plaintiff] what to look for," "showed [Plaintiff] how to do documentation," and "assisted Plaintiff] as best as [Mr. Vargas] could."  (Def. 56.1 Statement ¶¶ 98-99.)  Mr. Vargas also showed Plaintiff how he had completed some of his engineering projects, including a project that involved the installation of a generator,

and showed Plaintiff how to complete certain administrative forms. (Def. 56.1 Statement ¶¶ 100-102.)

Plaintiff later identified Mr. Vargas as a witness in Plaintiff's EEO proceeding and Mr. Vargas testified that he did "not conclude that [his] 1st or 2nd line supervisors discriminated against [Plaintiff] for race/gender/age/sexual orientation/etc. Nor was the office a hostile work environment to work in. Another co-worker and I are of African American descent as well, and if there was racial discrimination it would be towards all of us not just one person." (Def. 56.1 Statement ¶ 105; ECF No. 53-28, Def. Ex. 28, Vargas Aff. at 2, 5-6.)

### 1. Plaintiff's Assignments

Plaintiff was assigned to work on four projects while employed at the VA: "(1) St. Albans Install Generator Project, (2) Oncology Pharmacy Renovation Project, (3) Design Upgrade Architectural Finishes, and (4) Critical Life Safety Project." (Def. 56.1 Statement ¶ 63.)

As to the St. Albans Install Generator Project, Plaintiff submitted an "Independent Government Cost Estimate" ("ICGE") for the project on April 17, 2019.[5] (Def. 56.1 Statement ¶ 67; ECF

---

[5] The St. Albans ICGE submitted by Plaintiff appears to erroneously list April 17, 2018 as the date of submission, however, Plaintiff was not employed by the VA until February 3, 2019 and Defendant's exhibits demonstrate that Plaintiff emailed the St. Albans ICGE to Philip Civello on April 17, 2019. (ECF No. 53-9, Def. Ex. 9, St. Albans ICGE at 2; ECF No. 53-10, Def Ex. 10, E-mail from Plaintiff to Mr. Civello dated Apr. 17, 2019 at 2.)

No. 53-9, Def. Ex. 9 at 2.)  The ICGE included line items for "1. Construction Work Breakdown," which is split into further subcategories for line items such as electrical, plumbing, structural, demolition, exterior improvement, abatement, temperature systems, and earth work; "2. Construction Profit and Overhead Cost"; "3. Construction Materials Cost"; and "4. A/E Design Fee."  (Def. 56.1 Statement ¶¶ 68-69; ECF No. 53-9, Def. Ex. 9 at 2.)  The ICGE also included columns for "Estimated Hours," "Rate[ ] Per Hour ($)," and "Total Estimated Cost ($)."  (ECF No. 53-9, Def. Ex. 9 at 2.)

To "determine the total estimated cost, Plaintiff was required to multiply the estimated hour[s] by the rate per hour, and add up all the subcategories and categories [set forth on] the ICGE."[6]  (Def. 56.1 Statement ¶ 70.)  On the St. Albans ICGE, however, Plaintiff determined a total project cost of $1,430,000.00, but "left blank the [columns for] estimated hours and rates per hour."[7]  (Def. 56.1 Statement ¶¶ 71-72; ECF No. 53-

---

[6] Plaintiff's response does not specifically dispute Defendant's statement and instead states that "he never visited the site and specifically asked to visit but was denied and followed the prior SOW completed by another General Engineer and the instructions and directions of his supervisor Philip Civello."  (Def. 56.1 Statement ¶ 70, Pl. Response.)  As set forth in Footnote 3, *supra*, Plaintiff's response does not establish a material dispute of fact.  Local Rule 56.1 provides that each statement of fact "will be deemed admitted for purposes of the motion unless specifically controverted" by the opposing party.  "Accordingly, 56.1 statements not explicitly denied by [P]laintiff are deemed admit[ted]."  *Buckman v. Calyon Sec. (USA) Inc.*, 817 F. Supp. 2d 322, 328 n.42 (S.D.N.Y. 2011) (citing *Stepheny v. Brooklyn Hebrew Sch. For Special Children*, 456 F. Supp. 2d 248, 255 n.4 (E.D.N.Y. 2005)).

[7] Plaintiff denies these statements, but his cited materials do not support his contention or establish a disputed fact.  Local Rule 56.1(d) provides that

9, Def. Ex. 9 at 2.)

In an email dated April 17, 2019, Plaintiff's direct supervisor, Mr. Civello, informed Plaintiff that his "estimate [for the project of $1,430,000.00] does not include the cost of the new generator itself," which would need to be included in the St. Albans ICGE.  (Def. 56.1 Statement ¶ 75.)  In an April 24, 2019 email, Mr. Civello also asked Plaintiff, "[d]idn't you get the A/E's construction estimate cost estimate for the Replace 250 Penske generator[?] That estimate should be broken down by labor and material and should show the hourly rates and hours for each trade.  This is not what I said to do."  (Def. 56.1 Statement ¶ 76; ECF No. 53-10, Def. Ex. 10 at 4.)  Ultimately, Plaintiff underestimated the cost of the St. Albans Install Generator Project by "over $1 million," in part due to his failure to factor in the cost of the generator and his failure to detect the need to replace antiquated switchgear, an issue later identified by the General Engineer who took over the St. Albans Install Generator Project from Plaintiff.  (Def. 56.1 Statement ¶¶ 77-80.)

---

"[e]ach statement of material fact by a movant or opponent must be followed by citation to evidence which would be admissible" as required by Fed. R. Civ. P. 56(e).  "[D]istrict courts in the Southern and Eastern Districts of New York have interpreted current Local Rule 56.1 to provide that 'where there are no[ ] citations *or where the cited materials do not support the factual assertions in the Statements*, the Court is free to disregard the assertion.'"  *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73-74 (2d Cir. 2001) (emphasis added) (collecting cases).  Accordingly, facts Plaintiff disputes without citing to admissible evidence or without citing to evidence that supports the factual assertions in his response, will be deemed admitted.  *Id.*

Mr. Fares, who recommended that Plaintiff be terminated, testified that Plaintiff did not understand the assigned projects, had "no urgency to move the project forward," and was "more focused on . . . self-development, getting his certificate, [and] getting some training." (Def. 56.1 Statement ¶ 85; ECF No. 53-1, Def. Ex. 1 at 22.)

### 2.    Plaintiff's Requests for Training

General Engineers at the VA are required to complete the Contracting Officer Representative Training ("COR Training"), which gives General Engineers "the legal authority to provide direction [and] coordination throughout [a] project."[8] (Def. 56.1 Statement ¶¶ 109-10; ECF No. 53-1, Def. Ex. 1, Fares Tr. at 11.) Plaintiff completed COR Training in March 2019 and was designated

---

[8] Plaintiff denies this statement and cites to "Fares 2021 EEOC Hearing Trs pp. 59-63," which is purportedly attached to the Amended Declaration of Anthony Ofodile as Exhibit 1. (*See* Def. 56.1 Statement ¶ 109, Plaintiff's Response; ECF No. 62, Am. Decl. Anthony Ofodile ¶ 2.) As an initial matter, the Court notes that Mr. Fares's EEOC Hearing Transcript was not attached as Exhibit 1 to Mr. Ofodile's Declaration, but was submitted by Defendant as Ex. B to a Letter dated February 28, 2025. (*See* ECF No. 57, Letter dated Feb. 28, 2025.) On August 27, 2025, Plaintiff filed a letter advising the Court that certain exhibits—including Mr. Fares' EEOC Hearing Transcript—were misfiled or not filed at all, and seeking to re-file the correctly labelled exhibits. (*See* ECF No. 69 at 1.) On September 3, 2025, Defendant advised the Court that they did not object to Plaintiff's motion, and, on September 9, 2025, Plaintiff filed the corrected exhibits. (*See* ECF No. 73, Def. Resp.; ECF Nos. 75 & 76, Corrected Ofodile Decls. & Exhibits; ECF No. 77, Pl. Letter dated Sept. 9, 2025.)

Having reviewed the EEOC Hearing Transcript for Mr. Fares, the cited transcript does not support Plaintiff's assertion that any training beyond the COR Training was required to perform the job of General Engineer. Accordingly, as noted in Footnote 3, *supra*, facts Plaintiff disputes without citing to admissible evidence or without citing to evidence that supports the factual assertions in his response, will be deemed admitted. *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73-74 (2d Cir. 2001) (emphasis added) (collecting cases).

for work as a COR immediately thereafter.  (Def. 56.1 Statement ¶¶ 112-13.)  Despite being trained and qualified as a COR, Plaintiff could not articulate the role of a Contracting Officer. (Def. 56.1 Statement ¶ 61.)

The VA also requires employees to complete administrative training on topics such as ethics, time keeping, and attendance. (Def. 56.1 Statement ¶ 114.)  Technical trainings, such as Life Safety Code Trainings and Occupational Safety and Health Administration ("OSHA") Trainings are occasionally available to General Engineers at the VA, but do not "take precedence over any priority for the [VA] medical center."  (Def. 56.1 Statement ¶ 115; ECF No. 53-1, Def. Ex. 1, Fares Tr. at 10-11.)

On February 28, 2019, Peter Leszczak sent an email stating that it was the "Last Call" to sign up for Life Safety Code Training, which Mr. Civello forwarded to Plaintiff the same day with the message, "Chris, please make sure you sign up to take this training.  This is the last call to register so review it and let me know if there's any action required by me."  (Def. 56.1 Statement ¶ 116; ECF No. 53-29, Def. Ex. 29 at 2.)  Plaintiff did not submit a request for the Life Safety Code Training referenced in Mr. Leszczak's February 28, 2019 E-mail until March 15, 2019, five days before the training was scheduled to take place.  (Def. 56.1 Statement ¶ 117.)  Mr. Civello approved Plaintiff's request on March 18, 2019, but Plaintiff failed to request a travel

17

authorization and did not attend the training. (Def. 56.1 Statement ¶ 118.)

On May 10, 2019, Mr. Civello nominated Plaintiff for the next available OSHA-30 Training. (Def. 56.1 Statement ¶ 119.) On May 14, 2019, Plaintiff emailed Mr. Leszczak to ask when the next Life Safety Code and OSHA training would be held, and Mr. Leszczak informed Plaintiff that none were currently scheduled. (Def. 56.1 Statement ¶ 120.)

On May 19, 2025, Plaintiff sought to attend an electrical continuing education seminar for his New Jersey Electrical Inspector HHS License. (Def. 56.1 Statement ¶ 123.) Mr. Fares informed Plaintiff that a New Jersey Electrical Inspector HHS License was "not required by the agency" and, as a result, Plaintiff could use annual leave to attend the training, but Mr. Fares could not authorize the VA to pay for the training. (Def. 56.1 Statement ¶ 125.)

**C.   Plaintiff's Evaluations and Termination from the VA**

On May 3, 2019, Plaintiff had a 90-day progress review with Mr. Fares, Mr. Civello, and Plaintiff's union representative, Pete Marsala. (Pl. 56.1 Counterstatement ¶ 19, Def. Response; ECF No. 56-5, Def. Ex. 39.) As part of the 90-day progress review, Plaintiff received a letter titled "Placement follow up evaluation and progress review," signed by Mr. Fares and Plaintiff, which made the following observations regarding Plaintiff's performance:

18

> 1. Lack of understanding of agency goals and vision; 2. Lack of job knowledge such as cost estimating, SOW writing, project management and COR responsibilities; 3. Incapable of adapting to teamwork environment; 4. Unprofessional behaviors towards coworkers; 5. Multiple tardiness; [and] 6. Abuse of time.

(Def. 56.1 Statement ¶ 126; ECF No. 53-16, Def. Ex. 16 at 2.) The letter also informed Plaintiff that his performance was "adversely impacting" VA operations and that if Plaintiff did "not immediately improve [his] performance and sustain it at an acceptable level or if there are any other performance problems, [Plaintiff] will be subject to further disciplinary action up to and including termination of employment." (Def. 56.1 Statement ¶¶ 127-28; ECF No. 53-16, Def. Ex. 16 at 2.)

On July 8, 2019, Plaintiff emailed an Equal Employment Opportunity ("EEO") Specialist in the VA's New York Harbor Healthcare System EEO Office, Milagros M. Andino, and stated that he was "not trying to file a complaint," but had "questions about workplace harassment/bullying" that he would like to discuss. (Def. 56.1 Statement ¶¶ 129-30; ECF No. 53-17, Def. Ex. 17 at 4.)

On July 19, 2019, Plaintiff attended another progress evaluation meeting with Mr. Fares, Mr. Civello, and Mr. Marsala. (Def. 56.1 Statement ¶ 132; ECF No. 56-5, Def. Ex. 39, Evaluation Tr. at 2.) Plaintiff received a "NOT SATISFACTORY" performance grade in the "Job Knowledge and Performance Evaluation" review, which was signed only by Mr. Fares and a witness, Mr. Marsala, as

19

Plaintiff refused to sign.[9] (Def. 56.1 Statement ¶ 132; ECF No. 53-5, Def. Ex. 5 at 2-3; ECF No. 56-5, Evaluation Tr. at 2.) The "Job Knowledge and Performance Evaluation" review provided examples of Plaintiff's unsatisfactory performance, including, among other things, "poor performance and understanding of duties and responsibilities," "accus[ing] coworkers of setting [him] up for failure, which is a continuation of poor team work, failure to maintain professional behaviors and creating [a] hostile work place," and "complaining about workload." (ECF No. 53-5, Def. Ex. 5 at 2; Def. 56.1 Statement ¶ 132.)

Later the same day, on July 19, 2019, Mr. Fares sent a letter to the Chief of Human Resources with the subject "Termination Request," and requested that Plaintiff be terminated due to unsatisfactory performance and "unprofessional conduct towards his coworkers." (Def. 56.1 Statement ¶ 133; ECF No. 53-35, Def. Ex. 35 at 2.) On February 19, 2020, Linda Dawson, chief Human Resource Management Service, submitted a sworn affidavit as evidence in the

---

[9] Plaintiff alleges that the July 19, 2019 evaluation was "backdated," but cites no admissible evidence in support of this statement other than his own Affidavit. (Pl. 56.1 Counterstatement ¶ 38; ECF No. 65, Oji Aff. ¶¶ 30, 34.) This is not sufficient. Fed. R. Civ. P. 56(c)(4) requires supporting and opposing affidavits to "be made [based] on personal knowledge [and to] set forth such facts that would be admissible in evidence." An affidavit "grounded on suspicion, and bound together with rumor and hearsay" that is not grounded in "personal knowledge . . . of the events recounted in the affidavit" is not sufficient to allege material facts to withstand summary judgment. *Applegate v. Top Assoc., Inc.*, 425 F.2d 92, 96-97 (2d Cir. 1970); *see also Butler v. Raytel Med. Corp.*, 150 F. App'x 44, (2d Cir. 2005) (rejecting employee's affidavit that was "not supported by other record evidence or by specific examples in [employee's] own testimony"). Moreover, even if his evaluation was backdated, Plaintiff does not explain why that would be a material factual dispute warranting denial of Defendant's motion for summary judgment.

adjudication of Plaintiff's EEOC Complaint, confirming Mr. Fares had requested Plaintiff's termination prior to his termination on August 16, 2019, and had also provided documents in support of Plaintiff's unsatisfactory performance. (Pl. 56.1 Counterstatement ¶ 39.)

On July 19, 2019, Plaintiff again emailed EEO Specialist Ms. Andino and stated, "I work in the Engineering building and have endure[d] hostile work environment, discrimination, and bullying. I am attach[ing] a performance review which is bad and unacceptable.  I want to file a complaint and open up an investigation."  (Def. 56.1 Statement ¶ 134; ECF No. 53-17, Def. Ex. 34 at 3.)  Ms. Andino responded the same day and informed Plaintiff that he may request mediation or facilitation with his supervisor, but if he wished to file a complaint of discrimination, "contacting the local EEO office does not constitute an initial contact for complaint processing purposes." (Def. 56.1 Statement ¶ 135; ECF No. 53-34, Def. Ex. 34 at 2.)  Ms. Andino also provided the contact information for the Office of Resolution Management ("ORM") for filing a complaint of discrimination so that Plaintiff could "preserve [his] EEO rights."  (Def. 56.1 Statement ¶ 135; ECF No. 53-34, Def. Ex. 34 at 2.)

On July 22, 2019, a different EEO Specialist, Walter L. Williams, also provided Plaintiff with certain policies and informed Plaintiff that contacting the local New York Harbor

Healthcare System ("NYHHS") EEO Office did "not constitute an initial contact for complaint processing purposes." (Def. 56.1 Statement ¶ 136; ECF No. 53-17, Def. Ex. 17 at 2.)  Mr. Williams also provided the contact information for the VA's ORM for filing a complaint of discrimination. (Def. 56.1 Statement ¶ 136; ECF No. 53-17, Def. Ex. 17 at 2.)  Both Ms. Andino and Mr. Williams informed Plaintiff that he must contact ORM within 45 calendar days of the incident or personnel action that he considered to be discriminatory in nature. (ECF No. 53-17, Def. Ex. 17 at 2; ECF No. 53-34, Def. Ex. 34 at 2.)  Plaintiff initiated contact with an EEO counselor in the VA's ORM on July 22, 2019. (Def. 56.1 Statement ¶ 137.)

On July 23, 2019, Plaintiff emailed Mr. Civello and informed Mr. Civello that he would not come in to work due to a doctor's appointment. (Def. 56.1 Statement ¶ 138; ECF No. 53-37, Def. Ex. 37 at 2-3.)  The same day, Mr. Civello forwarded Plaintiff's email to Mr. Fares and noted that he advised Plaintiff "on Friday and Monday to enter his S[ick] L[eave] request in VATAS[, the Veterans Affairs Time and Attendance System].  The previous two S[ick] L[eave] request[s] have not been entered.  He was in yesterday at his desk for a while but did not enter today's S[ick] L[eave] request into VISTA either." (ECF No. 53-37, Def. Ex. 37 at 2.)  Mr. Fares responded, copying Plaintiff and others, and noted that Plaintiff "failed to follow supervisor instructions and violated

VA time and attendance policy.  Therefore, he will be charged AWOL for the time that he failed to request." (ECF No. 53-37, Def. Ex. 37 at 2.)   On July 29, 2019, Plaintiff received "Written Counseling" for insubordination, failure to carry out supervisor instructions, and violating agency time and attendance procedure, which led to Plaintiff being marked Absent Without Leave ("AWOL"). (Def. 56.1 Statement ¶ 138; ECF No. 53-38, Def. Ex. 38.)

On August 13, 2019, at Mr. Fares' recommendation, the VA terminated Plaintiff's employment during his one-year probationary period, citing "unsatisfactory performance" that was "adversely impacting the operations of [the] Section, the medical center, [and] patient care." (Def. 56.1 Statement ¶¶ 41, 140; ECF No. 53-4, Def. Ex. 4, Termination Letter dated Aug. 13, 2019.) Plaintiff's termination became effective on August 16, 2019. (Def. Ex. 4, Termination Letter dated Aug. 13, 2019.)

## LEGAL STANDARD

Summary judgment shall be granted to a movant who demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' for these purposes when it 'might affect the outcome of the suit under the governing law.'" *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 104 (2d Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  No genuine issue of material fact exists "unless there

is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 243.  "If the [non-moving party's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (citations omitted).

When bringing a motion for summary judgment, the movant carries the burden of demonstrating the absence of any disputed issues of material fact and entitlement to judgment as a matter of law. *Rojas*, 660 F.3d at 104.  In deciding a summary judgment motion, the court "must resolve all ambiguities and draw all reasonable inferences against the moving party." *Flanigan v. Gen. Elec. Co.*, 242 F.3d 78, 83 (2d Cir. 2001) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). A moving party may indicate the absence of a factual dispute by "showing . . . that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B).  Once the moving party has met its burden, the nonmoving party "must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).  Finally, the "mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the

plaintiff." *Anderson*, 477 U.S. at 252.

## DISCUSSION

### I.  Plaintiff's Title VII Discrimination Claims based on a Failure to Train (Claims One and Two)

Plaintiff's First and Second Causes of Action allege in part racial discrimination and discrimination in the terms and conditions of Plaintiff's employment when he was denied "necessary and required training," in violation of Title VII.[10]  (Am. Compl. ¶¶ 54, 56.)

Title VII prohibits an employer from discriminating against any individual with respect to "compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin."  42 U.S.C. § 2000e-2(a)(1).  "Before bringing a federal lawsuit under Title VII, [however,] a 'federal government employee must timely exhaust the administrative remedies at his disposal.'"  *Tassy v. Buttigieg*, 51 F.4th 521, 530 (2d Cir. 2022), *aff'd*, 51 F.4th 521 (2d Cir. 2022) (quoting *Mathirampuzha v. Potter*, 548 F.3d 70, 74 (2d Cir. 2008)); *see also Hardaway v. Hartford Pub. Works Dep't*, 879 F.3d 486, 489 (2d Cir. 2018) ("As a precondition to filing a Title VII claim in federal court, a plaintiff must first pursue available administrative remedies and file a timely complaint with the

---

[10] Plaintiff's First Cause of Action also alleges racial discrimination and discrimination in the terms and conditions of Plaintiff's employment when he was denied training in violation of Section 1981, which the Court addresses in Section II, *infra*.  (Am. Compl. ¶¶ 54.)

EEOC.").

EEOC regulations "establish the applicable administrative procedures that a federal employee must exhaust prior to filing suit," *Mathirampuzha*, 548 F.3d at 74-75, and include, among other things, that a claimant "must initiate contact with a[n] [EEO] [c]ounselor within 45 days of the date of the matter alleged to be discriminatory." 29 C.F.R. § 1614.105(a)(1). This "45-day period serves as a statute of limitations; thus, as a general rule, claims alleging conduct that occurred more than 45 days prior to the employee's initiation of administrative review are time-barred." *Fitzgerald v. Henderson*, 251 F.3d 345, 359 (2d Cir. 2001) (citations omitted).

"In considering the timeliness of discrete act claims, [the Second Circuit has] held that each actionable discrete act 'occur[s] on the day that it happened.'" *Tassy*, 51 F.4th at 531 (quoting *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 79 (2d Cir. 2015)). Indeed, courts in this Circuit routinely find that a "failure to train is a discrete act." *Id.* at 235 (citing *Harvin v. Manhattan & Bronx Surface Transit Operating Auth.*, No. 14-cv-5125 (CBA) (RER), 2018 WL 1603872, at *4 (E.D.N.Y. March 30, 2018), *aff'd*, 767 F. App'x 123 (2d Cir. 2019); *Bright v. Coca-Cola Refreshments USA, Inc.*, No. 12-cv-234 (BMC), 2014 WL 5587349, at *13 (E.D.N.Y. Nov. 3, 2014), *aff'd*, 639 F. App'x 6 (2d Cir. 2015); *Thomas v. City of New York*, 953 F. Supp. 2d 444, 452

(E.D.N.Y. 2013)).

The VA's EEO Policy Statement advises employees that to file an EEO complaint pursuant to 29 CFR § 1614 they "*must* contact the Office of Resolution Management ("ORM") within 45 calendar days" of the most recent incident of alleged discrimination or retaliation. (Def. 56.1 Statement ¶ 15; ECF No. 53-19, Def. Ex. 19 at 2 (emphasis added).) When Plaintiff reached out to the VA's local NYHHS EEO office on July 8, 2019 and July 19, 2019, both EEO employees informed Plaintiff that his email did not constitute an initial contact for filing a discrimination complaint and that he must contact the VA's ORM to file a discrimination complaint and preserve his EEO rights. (ECF No. 53-17, Def. Ex. 17 at 3; ECF No. 53-34, Def. Ex. 34 at 2.) Nevertheless, Plaintiff did not initiate contact with an EEO counselor in the VA's ORM and file a discrimination complaint until July 22, 2019. (Def. 56.1 Statement ¶ 137.) Based on the July 22, 2019 date of contact, any discrete act of discrimination that occurred prior to June 7, 2019 is "barred by the applicable statute of limitations." *Tassy*, 51 F.4th at 531.

Plaintiff cannot point to a single instance in which he was denied training during this limitations period. Accordingly, Plaintiff's First and Second Causes of Action based on an alleged failure to train in violation of Title VII "must be dismissed as time-barred." *Tassy*, 51 F.4th at 533.

## II.  Plaintiff's Remaining Discrimination Claims under Section 1981 and Title VII (Claims One and Six)

Plaintiff's First Cause of Action also alleges racial discrimination and discrimination in the terms and conditions of Plaintiff's employment when he was denied "necessary and required training," in violation of Section 1981.  (Am. Compl. ¶ 54.) Plaintiff's Sixth Cause of Action alleges Plaintiff was "discriminated against when he was given [an] unsatisfactory evaluation, declared AWOL and his employment [was] terminated in August 2019 because he is Black and of Nigerian national origin" in violation of Section 1981 and Title VII.  (Am. Compl. ¶ 64.)

### A.  Legal Standard

As noted above, Title VII prohibits an employer from discriminating against any individual with respect to "compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin."  42 U.S.C. § 2000e-2(a)(1).  "As relevant here, [Section] 1981 claims of racial discrimination are analyzed under the same [substantive] standard as Title VII claims of discrimination." *McKinney v. County of Dutchess*, No. 24-1195, 2025 WL 1499364, at *2 (2d Cir. May 27, 2025) (Summary Order) (citing *Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010)).

Under the Supreme Court's *McDonnell Douglas* burden-shifting framework, "a plaintiff must first establish a *prima facie* case of

discrimination by showing: (1) [he] belonged to a protected class, (2) was qualified for the position [he] held or sought, and (3) suffered an adverse employment action (4) under circumstances giving rise to an inference of discriminatory intent." *Fanelli v. New York*, 200 F. Supp. 3d 363, 370 (E.D.N.Y. 2016) (citing *Terry v. Ashcroft*, 336 F.3d 128, 137-38 (2d Cir. 2003)); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). "The burden that an employment discrimination plaintiff must meet in order to defeat summary judgment at the *prima facie* stage is *de minimis*." *McLee v. Chrysler Corp.*, 109 F.3d 130, 134 (2d Cir. 1997) (citing *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 203-04 (2d Cir. 1995); *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d Cir. 1994); *Dister v. Cont'l Group, Inc.*, 859 F.2d 1108, 1114 (2d Cir. 1988)).

"[O]nce a plaintiff has established a prima facie case, the burden shifts to the defendant, which is required to offer a legitimate, non-discriminatory rationale for its actions." *Terry*, 336 F.3d at 138 (citing *McDonnell Douglas*, 411 U.S. at 802). "[O]nce the defendant has made a showing of a neutral reason for the complained of action, 'to defeat summary judgment . . . the plaintiff's admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination.'" *Terry*, 336 F.3d at 138 (quoting *Stern v. Trustees of Columbia Univ. in the City of N.Y.*,

131 F.3d 305, 312 (2d Cir. 1997)).

**B.  Application**

**1.  *Prima Facie* Case of Discrimination**

Here, the Parties do not dispute that Plaintiff is a member of a protected class.  The Parties dispute, however, whether Plaintiff was qualified for the position of General Engineer as a GS level 12 employee and whether Plaintiff suffered an adverse employment action.  The Court will address each of these arguments in turn.

**a.  Qualifications**

First, the Court finds Plaintiff has established he was qualified to be hired on a probationary basis for the role of General Engineer.  "The Court's task in assessing Plaintiff's qualifications at the *prima facie* stage is a limited one." *E.E.O.C. v. Town of Huntington*, No. 05-cv-4559 (DRH) (WDW), 2008 WL 361136, at *6 (E.D.N.Y. Feb. 8, 2008).  The Second Circuit has "long emphasized that the qualification prong must not be interpreted in such a way as to shift into the plaintiff's *prima facie case* an obligation to anticipate and disprove the employer's proffer of a legitimate, non-discriminatory basis for its decision." *Gregory v. Daly,* 243 F.3d 687, 696 (2d Cir. 2001) (citation omitted).  "Rather, [Plaintiff] need only make the 'minimal showing' that [he] possesses the basic skills necessary for the performance of the job." *Id.*

30

Here, Defendant admits that Mr. Fares testified that he believed Plaintiff had the experience the VA was looking for in the role of General Engineer when Plaintiff was hired. (*See* Pl. 56.1 Counterstatement ¶ 7, Def. Resp.) Moreover, it is undisputed that Mr. Fares interviewed approximately five applicants for the role of General Engineer before offering the position to Plaintiff. (*See* Pl. 56.1 Counterstatement ¶ 14, Def. Response.) Plaintiff's resume also includes experience in the engineering field, including experience doing cost estimates and reviewing engineering design drawings. (Pl. 56.1 Counterstatement ¶¶ 3-5, 8, 10.) Before hiring Plaintiff, Defendant conducted a background check, which involved checking Plaintiff's work history, prior to offering Plaintiff the role. (Pl. 56.1 Counterstatement ¶ 13.)

Accordingly, based on these factors, contrary to Defendant's contentions that Plaintiff was not qualified for the position, Plaintiff has made the "minimal showing" that he "possesses the basic skills necessary for performance of [the] job," particularly where, as here, he was ultimately hired for the position. *Owens v. N.Y. City Housing Auth.*, 934 F.2d 405, 409 (2d Cir. 1991) (quoting *Powell v. Syracuse Univ.*, 580 F.2d 1150, 1155 (2d Cir. 1978), *cert. denied*, 439 U.S. 984 (1978)); *see also Gregory*, 243 F.3d at 696 ("In a discharge case in which the employer has already hired the employee into the job in question, the inference of minimal qualification is . . . easier to draw.").

31

### b.    Adverse Employment Action

Next, Defendant argues that Plaintiff cannot establish that unsatisfactory performance evaluations and placement on absent without leave ("AWOL") status (Claim Six), as well as a denial of training (Claim One) constitute "legally actionable adverse employment action[s]."[11]   (ECF No. 51, Def. Mot. at 14.)   This Court agrees.   Moreover, Plaintiff fails to provide any response to Defendant's argument as to the third element of a *prima facie* case of discrimination.[12]

A materially adverse employment action must be "more disruptive than a mere inconvenience or an alteration of job responsibilities" and must cause "a materially adverse change in the terms and conditions of employment." *Schultz v. Congregation Shearith Israel of City of N.Y.*, 867 F.3d 298, 304 (2d Cir. 2017) (citation omitted).   "Examples of such a change include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other

---

[11] Defendant does not dispute that Plaintiff's termination constitutes an adverse action.   (*See* ECF No. 51, Def. Mot. at 14 n.2.)

[12] As set forth below, the Court finds that unsatisfactory performance evaluations, placement on AWOL status, and denial of training do not constitute adverse employment actions and, therefore, Plaintiff has failed to establish a *prima facie* claim of discrimination as to these claims.   Nevertheless, even assuming *arguendo* these actions could be considered adverse employment actions, Plaintiff has "abandoned these claims by failing to respond to Defendant's argument as to the third element of the *prima facie* case." *Townsend v. First Student*, No. 18-cv-1684 (VLB), 2021 WL 4798825, at *8 (D. Conn. Oct. 14, 2021), *aff'd*, 2023 WL 1807719 (2d Cir. Feb. 8, 2023).

indices . . . unique to a particular situation." *E.E.O.C. v. Bloomberg L.P.*, 967 F. Supp. 2d 816, 843 (S.D.N.Y. 2013) (quoting *Sanders v. N.Y.C. Human Resources Admin.*, 361 F.3d 749, 755 (2d Cir. 2004)).

First, it is well settled in this Circuit that absent any effect on Plaintiff's compensation, benefits, or title, a negative review or placement on an employment improvement plan is insufficient to constitute an adverse employment action. *See Brown v. Am. Golf Corp.*, 99 F. App'x 341, 343 (2d Cir. 2004) (Summary Order); *Kunik v. N.Y. City Dep't of Ed.*, 842 F. App'x 668, 672 (2d Cir. 2021) ("An 'unsatisfactory' performance review is not an adverse employment action where it does not affect a person's 'compensation, benefits, or job title.'") (quoting *Fairbrother v. Morrison*, 412 F.3d 39, 56-57 (2d Cir. 2005)). Moreover, even where, as here, an unsatisfactory review and improvement plan states that failure to abide by the terms could lead to termination, that fact "does not transform the [employment improvement plan] into a materially adverse employment action." *Gorman v. Covidien, LLC*, 146 F. Supp. 3d 509, 525 (S.D.N.Y. 2015) (citing *McGrath v. Thomson Reuters*, No. 10-cv-4944 (JSR) (JCF), 2012 WL 2119112, at *11 (S.D.N.Y. Apr. 30, 2012) (collecting cases), *report and recommendation adopted*, No. 10 Civ. 4944 (JSR) (JCF), 2012 WL 2122325 (S.D.N.Y. June 12, 2012), *aff'd*, 537 F. App'x 1 (2d Cir. 2013) (summary order)).

Second, placing Plaintiff on AWOL status after he failed to follow VA procedures for requesting sick leave does not constitute an adverse action because Plaintiff's AWOL status "was the direct result of [Plaintiff's] failure to provide [medical] documentation" in support of his request for leave. *Pierre v. Napolitano*, 958 F. Supp. 2d 461, 479 (S.D.N.Y. 2013). Indeed, courts in this district have repeatedly held that "[r]equiring an employee to provide medical documentation is not a materially adverse action." *Gentile v. Potter,* 509 F. Supp. 2d 221, 240–41 (E.D.N.Y. 2007). Accordingly, this Court finds that Plaintiff's AWOL status did not constitute a materially adverse action. *See Nicastro v. Runyon,* 60 F. Supp. 2d 181, 186 (S.D.N.Y. 1999) ("[M]any of the actions complained of by plaintiff, such as scrutiny from his supervisors that he deemed excessive, requiring documentation for sick leave, scrutiny of his wife's sick leave, the unexplained absence of certain documents that he thinks should be in his employment file, or threatening to investigate medical fraud, do not constitute 'adverse employment actions.'").

Third, and finally, the alleged denial of training does not constitute an adverse employment action because the training at issue was not a prerequisite for Plaintiff's employment and Plaintiff did not suffer any adverse consequences for not completing the training he requested. *See Trachtenberg v. Dep't of Educ. of City of N.Y.*, 937 F. Supp. 2d 460, 468 (S.D.N.Y.

2013) ("[Plaintiff] has not alleged any negative consequences resulting from the alleged denial of professional training, and therefore any such denial does not rise to the level of an adverse employment action.").

Plaintiff received the only necessary training—COR Training—within a month of starting his job and was designated for work as a COR immediately thereafter.  (Def. 56.1 Statement ¶¶ 112-13.) Plaintiff also received approval to attend each training he requested that was scheduled and available, but failed to attend due to his own failure to take necessary actions.  For example, Plaintiff did not submit a travel authorization to attend the scheduled Life Safety Code Training, Plaintiff was nominated for the next available OSHA-30 training, but none were available to any employee at the time of Plaintiff's request, and Plaintiff received permission to use his annual leave to attend the New Jersey electrical license seminar, but was informed that the VA could not pay for it because it was not necessary to Plaintiff's job responsibilities.  (Def. 56.1 Statement ¶¶ 118, 120, 125.)

Ultimately, Plaintiff has failed to demonstrate *any* "material harm from the [alleged] denial [of training], such as a failure to promote or a loss of career advancement opportunities." *Trachtenberg,* 937 F. Supp. 2d at 468 (internal quotation marks and citation omitted).  Thus, "any failure by Defendants to provide Plaintiff with training does not rise to the level of an adverse

35

employment action." *Sekyere v. City of New YOrk,* No. 05-cv-7192 (BSJ) (DCF), 2009 WL 773311, at *4 (S.D.N.Y. Mar. 18, 2009).

Accordingly, based on the undisputed facts, the Court finds that "viewed both individually and cumulatively" Plaintiff's unsatisfactory performance evaluations and placement on absent without leave ("AWOL") status (Claim Six), as well as the alleged denial of training (Claim One) "do not amount to adverse employment actions sufficient to establish a *prima facie* case of discrimination to form the basis of a claim under Title VII" or Section 1981. *Sekyere,* 2009 WL 773311, at *6. Accordingly, Defendant's motion for summary judgment as to Claim One is GRANTED in its entirety and Defendant's motion for summary judgment as to Claim Six is GRANTED as to Plaintiff's unsatisfactory performance evaluations and placement on absent without leave ("AWOL") status.

### 2.    Plaintiff has Abandoned his Final Discrimination Claim Arising out of his Termination

Turning to Plaintiff's final claim of discrimination arising out of his termination from his probationary position (Claim Six), the Court finds that Plaintiff abandoned this claim by failing to make any arguments in opposition to Defendant's motion. "Where, as here, a counseled non-moving party submits 'a partial response arguing that summary judgment should be denied as to some claims while not mentioning others,' that response 'may be deemed an abandonment of the unmentioned claims.'" *Camarda v. Selover,*

673 F. App'x 26, 30 (2d Cir. 2016) (quoting *Jackson v. Fed. Express*, 766 F.3d 189, 195 (2d Cir. 2014)). "Even '[w]here abandonment by a counseled party is not explicit,' a court may infer abandonment 'from the papers and circumstances viewed as a whole.'" *Id.* (quoting *Jackson*, 755 F.3d at 196).

Although Plaintiff responded to each of Defendant's proposed undisputed facts, Plaintiff argues only that summary judgment should be denied as to his retaliation and hostile work environment claims, but not his discrimination claim based on his termination. (*See* ECF No. 59, Pl. Opp. at 23 ("Based on the foregoing, plaintiff respectfully requests that the Court deny the defendant's motion for summary judgment seeking to dismiss his claims of retaliation and hostile work environment.")); *see Jackson*, 766 F.3d at 195 ("[A] partial response arguing that summary judgment should be denied as to some claims while not mentioning others may be deemed an abandonment of the unmentioned claims.").

Moreover, Plaintiff's only argument in support of his discrimination claims is that he was qualified for the role of General Engineer as a GS level 12 employee. (*See* ECF No. 59, Pl. Opp. at 4-6.) Plaintiff fails to respond to any of Defendant's remaining arguments that the VA had legitimate, non-discriminatory reasons for Plaintiff's termination and that Plaintiff did not demonstrate with admissible evidence any pretext that Defendant's reasons for Plaintiff's termination were based in whole or in part

on discrimination. (*See* ECF No. 51, Def. Mot. at 19-25.) Plaintiff does, however, provide a fulsome opposition to Defendant's motion for summary judgment as to his retaliation and hostile work environment claims, thereby supporting an inference that "abandonment [of his discrimination claims] was intended." *Jackson*, 766 F.3d at 196 ("Generally . . . a partial response reflects a decision by a party's attorney to pursue some claims or defenses and to abandon others.").

Accordingly, the Court finds that Plaintiff has abandoned his remaining discrimination claims and Defendant's motion for summary judgment as to Plaintiff's discrimination claim arising out of his termination (Claim Six) is GRANTED. *See Kovaco v. Rockbestos-Surprenant Cable Corp.*, 834 F.3d 128, 144 (2d Cir. 2016) (affirming district court's finding of abandonment where defendant moved for summary judgment on all claims and plaintiff opposed the motion with respect to all but one variety of claim).

**III. Plaintiff's Retaliation Claims (Claims Three, Four, and Five)**

Plaintiff alleges three causes of actions based on retaliation. Plaintiff's Third Cause of Action alleges that Plaintiff was "retaliated against when he was denied necessary training because he complained about what he believed to be discrimination" in violation of Section 1981 and Title VII. (Am. Compl. ¶ 58.) Plaintiff's Fourth Cause of Action alleges that Plaintiff was "retaliated against when he was given an

unsatisfactory evaluation in August 2019 because he complained about what he believed to be discrimination" in violation of Section 1981 and Title VII.  (Am. Compl. ¶ 60.)  Plaintiff's Fifth Cause of Action alleges that Plaintiff was "retaliated against when he was declared AWOL and/or terminated in August 2019 because he complained about what he believed to be discrimination" in violation of Section 1981 and Title VII.  (Am. Compl. ¶ 62.)

### A.  Legal Standard

As with Plaintiff's discrimination claims, "[a]ll of [Plaintiff's] retaliation claims [under Section 1981] are analyzed pursuant to Title VII principles." *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010) (citing *Patterson v. County of Oneida,* 375 F.3d 206, 225 (2d Cir. 2004) ("Most of the core substantive standards that apply to claims of discriminatory conduct in violation of Title VII are also applicable to claims of discrimination in employment in violation of § 1981 or the Equal Protection Clause.")).  Title VII's anti-retaliation provision makes it unlawful "for an employer to discriminate against any . . . employee[ ] or applicant[ ] . . . because [that individual] opposed any practice" made unlawful by Title VII or "made a charge, testified, assisted, or participated in" a Title VII investigation or proceeding.  42 U.S.C. § 2000e-3(a).  "This anti-retaliation provision is intended to further the goals of the anti-discrimination provision 'by preventing an employer from

39

interfering (through retaliation) with an employee's efforts to secure or advance enforcement of [Title VII's] basic guarantees.'" *Hicks*, 593 F.3d at 164 (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 63 (2006)).

These claims are also assessed under the "burden-shifting framework laid out in *McDonnell Douglas*." *Summa v. Hofstra Univ.,* 708 F.3d 115, 125 (2d Cir. 2013); *McDonnell Douglas*, 411 U.S. at 802-05. First, Plaintiff must establish a *prima facie* case of retaliation by demonstrating: "(1) [he] engaged in protected activity; (2) the employer was aware of this activity; (3) the employee suffered a materially adverse employment action; and (4) there was a causal connection between the alleged adverse action and the protected activity." *Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.,* 716 F.3d 10, 14 (2d Cir. 2013) (per curiam) (quoting *Lore v. City of Syracuse,* 670 F.3d 127, 157 (2d Cir. 2012)). Here again Plaintiff's burden is "*de minimis*" and "the court's role in evaluating a summary judgment request is to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive." *Jute v. Hamilton Sundstrand Corp.,* 420 F.3d 166, 173 (2d Cir. 2005) (internal quotation marks omitted). Nevertheless, "[i]t is axiomatic that, to be retaliatory, the adverse employment action must occur *after* the plaintiff complains of discriminat[ion]." *Lawson v. City of New York*, 595 F. App'x

40

89, 90 (2d Cir. 2015) (emphasis added).

Should Plaintiff satisfy this initial burden, "a presumption of retaliation arises" and the Defendant must then "articulate a legitimate, non-retaliatory reason for the adverse employment action." *Jute,* 420 F.3d at 173. If Defendant satisfies this burden, "the presumption of retaliation dissipates, and the plaintiff must show that, *but for* the protected activity, [he] would not have been terminated." *BowenHooks v. City of New York*, 13 F. Supp. 3d 179, 221 (E.D.N.Y. 2014) (quoting *Univ. of Tx. S.W. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013) (emphasis added) (holding that a plaintiff "must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer")). This "requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrong action or actions of the employer." *Id.* at 231 (citing *Nassar*, 570 U.S. at 360).

### B. Application

#### 1. Plaintiff's claims of retaliation based on failure to train, negative performance reviews, and termination.

Here, Plaintiff cannot establish a *prima facie* case of retaliation based on failure to train, negative performance reviews, and termination because he cannot demonstrate a "causal connection between the protected activity and the adverse employment action." *Kwan v. Andalex Group LLC*, 737 F.3d 834, 844

(2d Cir. 2013).  Moreover, these alleged adverse actions occurred *before* he engaged in protected activity.  As noted above, "[i]t is axiomatic that, to be retaliatory, the adverse employment action must occur *after* the plaintiff complains of discriminat[ion]." *Lawson*, 595 F. App'x at 90 (emphasis added).

Plaintiff first engaged in protected activity on July 19, 2019 when he emailed an EEO Specialist in the local VA NYHHS Office and wrote, "I work in the Engineering building and have endure[d] hostile work environment, discrimination, and bullying.  I am attach[ing] a performance review which is bad and unacceptable.  I want to file a complaint and open up an investigation" (the "July 19 Email")[13]  (Def. 56.1 Statement ¶ 134; ECF No. 53-17, Def. Ex. 34 at 2.)  Plaintiff asserts that he was denied training, received negative performance reviews, marked AWOL, and terminated in retaliation for engaging in this protected activity.

It is undisputed, though, that each of Plaintiff's requests for training occurred between March and May 2019, before the July

---

[13] Plaintiff asserts that he also engaged in protected activity on May 26, 2019 when he emailed Mr. Fares and Mr. Civello raising concerns about Plaintiff's relationship with Mr. Ha, and again on July 8, 2019 when he emailed an EEO Specialist in the local VA NYHHS Office and stated that he was "not trying to file a complaint," but had "questions about workplace harassment/bullying" that he would like to discuss.  (ECF No. 59, Pl. Opp. at 7; ECF No. 63-1, Pl. Ex. 5 at 2-3 (Pl. email to Mr. Fares and Mr. Civello dated May 26, 2019); Def. 56.1 Statement ¶¶ 129-30; ECF No. 53-17, Def. Ex. 17 at 4 (Pl. email to EEO Specialist dated July 8, 2019).)  Neither of these emails make any reference to racial or national origin discrimination, retaliation, or a hostile work environment and, as a result, they do not constitute protected activity as they "cannot reasonably be construed as an implicit complaint about unlawful conduct." *Marseille v. Mount Sinai Hosp.*, No. 21-2140, 2022 WL 14700981, at *2 (2d Cir. 2022) (Summary Order).

19, 2019 email.  (Def. 56.1 Statement ¶¶ 117, 118, 120, 123, 125.) Moreover, Plaintiff's first progress review occurred on May 3, 2019.  (Def. 56.1 Statement ¶ 126; ECF No. 53-16, Def. Ex. 16 at 2.)  During this review, Plaintiff was advised that his performance was "adversely impacting" VA operations and his supervisors had observed, among other things, a "lack of understanding of agency goals and vision"; a "lack of job knowledge"; an inability to adapt to a teamwork environment; "unprofessional behaviors"; and tardiness. (*Id.*)  Plaintiff's next progress review occurred on July 19, 2019, during which Plaintiff was advised that his performance continued to be unsatisfactory for the same reasons stated during his May 19, 2019 Progress Review, except for tardiness.  (ECF No. 53-5, Def. Ex. 5 at 2.)  The same day, on July 19, 2019, Mr. Fares submitted a request for Plaintiff's termination to Human Resources, citing unsatisfactory performance. (Def. 56.1 Statement ¶ 133; ECF No. 53-35, Def. Ex. 35 at 2.)

Plaintiff's July 19 Email to the VA's EEO Specialist plainly occurred after Plaintiff's performance review as it both references and attaches the performance review letter.  (Def. 56.1 Statement ¶ 134; ECF No. 53-34, Def. Ex. 34 at 2.)  Moreover, although Plaintiff did not receive a termination letter until August 13, 2019, his termination was set in motion based on his negative performance review on July 19, 2019 and "it is well-settled that an adverse employment action cannot serve as the basis

for a retaliation claim [where, as here,] the action was set in motion before a plaintiff engaged in protected activity." *Cayemittes v. City of N.Y. Dep't of Hous. Pres. & Dev.*, 974 F. Supp. 2d 240, 262 (S.D.N.Y. 2013) (collecting cases).

Accordingly, Plaintiff cannot establish a causal nexus to support his claims for retaliation based on failure to train, negative performance reviews, and termination, and summary judgment is granted in favor of Defendant on this aspect of Plaintiff's retaliation claim. *See Slattery v. Swiss Reins. Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001) (Where, as here, "timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise.").

### 2. Plaintiff's claims of retaliation based on his AWOL status

Although Plaintiff was marked AWOL for insubordination, failure to carry out supervisor instructions, and violating agency time and attendance procedure on July 29, 2019, after he engaged in protected activity, Plaintiff "has not identified any evidence from which it may be reasonably inferred that his being charged with AWOL . . . on the dates in question constitutes a materially adverse action for purposes of his retaliation claim." *Johnson v. Lew*, No. 13-cv-1072 (GTS) (CFH), 2017 WL 3822047, at *14 (N.D.N.Y. Aug. 30, 2017) (citing *Hicks v. Baines*, 593 F.3d 159, 165 (2d Cir.

44

2010) ("Actions are materially adverse if they are harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination.")).

Mr. Fares' request to terminate Plaintiff on July 19, 2019 listed unsatisfactory performance and unprofessional conduct as the reasons for the recommendation.  (ECF No. 53-35, Def. Ex. 35 at 2.)  Moreover, Plaintiff's Termination Letter dated August 13, 2019 stated that he was terminated at Mr. Fares' recommendation due to unsatisfactory performance, not for attendance or being marked AWOL.  (ECF No. 53-4, Def. Ex. 4 at 2.)  Thus, "the record does not support the conclusion that Plaintiff was disciplined or that he was terminated, was demoted, or suffered any other employment-related consequences as a result of being charged with AWOL on the dates at issue (or, for that matter, on any dates) . . . [and] being charged with AWOL would not have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Johnson*, 2017 WL 3822047 at *14.

Accordingly, for the foregoing reasons, Defendant's motion for summary judgment as to Plaintiff's retaliation claims based on Plaintiff's AWOL status is GRANTED.

## IV.  **Plaintiff's Hostile Work Environment Claim (Claim Seven)**

Plaintiff's Seventh, and final, Cause of Action alleges that he was subjected to a hostile work environment based on his race and national origin and "in retaliation for complaining about what

45

he believed to be discriminatory terms and conditions of employment" in violation of Section 1981 and Title VII. (Am. Compl. ¶ 66.)

### A. Legal Standard

Hostile work environment claims under Title VII and Section 1981 are evaluated under the same substantive standards. *Rivera v. Rochester Genesee Reg. Transp. Auth.*, 743 F.3d 11, 20 n.4 (2d Cir. 2014). To establish a claim of hostile work environment, a plaintiff must establish (1) "that the workplace was 'permeated with discriminatory intimidation, ridicule and insult . . . that is sufficiently severe or pervasive to alter the conditions of his work environment'" and (2) "that a specific basis exists for imputing the conduct that created the hostile environment to the employer." *Dayes v. Pace Univ.*, 2 F. App'x 204, 207 (2d Cir. 2001) (quoting *Howley v. Town of Stratford*, 217 F.3d 141, 153-54 (2d Cir. 2000)) (citing *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21 (1993)).

The first element of a hostile work environment claim requires allegations that demonstrate that the environment was both objectively and subjectively hostile and abusive. *See Gregory,* 243 F.3d at 691-692. "It is axiomatic that the plaintiff also must show that the hostile conduct occurred because of a protected characteristic." *Tolbert v. Smith*, 790 F.3d 427, 439 (2d Cir. 2015) (citing *Alfano v. Costello*, 294 F.3d

46

365, 374 (2d Cir. 2002)). Moreover, the conduct in question "must be severe or pervasive enough to create an environment that 'would reasonably be perceived, and is perceived, as hostile or abusive.'" *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir. 1997) (quoting *Harris,* 510 U.S. at 22).

To determine whether a work environment is sufficiently hostile, "courts consider the totality of the circumstances, including such factors as '(1) the frequency of the discriminatory conduct; (2) its severity; (3) whether the conduct was physically threatening or humiliating, or a mere offensive utterance; (4) whether the conduct unreasonably interfered with plaintiff's work; and (5) what psychological harm, if any, resulted.'" *Lumhoo v. Home Depot USA, Inc.*, 229 F. Supp. 2d 121, 152 (E.D.N.Y. 2002) (citing *Richardson v. New York State Dep't of Correctional Serv.*, 180 F.3d 426, 437 (2d Cir. 1999)).

When evaluating the "quantity, frequency, and severity" of the incidents, the court must look at the incidents "cumulatively in order to obtain a realistic view of the work environment." *Schwapp,* 118 F.3d at 111. "The incidents at issue must be 'more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.'" *Bacchus v. New York City Dep't of Educ.*, 137 F. Supp. 3d 214, 240 (E.D.N.Y. 2015) (citing *Das v. Consolidated School Dist. of New Britain*, 369 F. Appx 186, 190 (2d Cir. 2010)).

**B.    Application**

Though it is undisputed that Plaintiff subjectively viewed his working environment as a hostile one, Plaintiff has cited no legal authority that Plaintiff experienced an objectively hostile work environment.  Looking at the incidents Plaintiff cites to "cumulatively," it is clear that they are the kind of "offhand comments and isolated incident[s]" that do not "amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton,* 524 U.S. 775, 788 (1998) (quotation marks and citation omitted).  Accordingly, the court grants Defendant summary judgment as to Plaintiff's hostile work environment claim.

Plaintiff testified that Mr. Ha, who did not supervise Plaintiff, told him about an experience Mr. Ha had in high school being bullied by African Americans that affected Mr. Ha's view of African Americans.  (ECF No. 57-4, Pl. Tr. at 23-24.)  Plaintiff also testified that Mr. Ha informed Plaintiff that he "didn't like the fact that [Plaintiff] was hired as a GS [level] 12 [employee] because . . . [Plaintiff] should have [been] hired . . . as a GS [level] 5 employee."  (ECF No. 57-4, Pl. Tr. at 25.)  On May 26, 2019, Plaintiff sent an email to Mr. Fares and Mr. Civello detailing his interactions with Mr. Ha, including Mr. Ha's comment that Plaintiff should have been hired as a GS level 5 employee, Mr. Ha's refusal to answer Plaintiff's questions, the fact that

48

Mr. Ha discouraged Plaintiff from seeking training or following certain instructions, such as adding Plaintiff's signature to emails, and Mr. Ha saying he does not give an "F" about Plaintiff in the presence of Mr. Fares and Mr. Civello.[14]    (ECF No. 63-1, Ofodile Ex. 5 at 3.)

These comments, considered in the context of the totality of Plaintiff's employment, are not so "severe or pervasive . . . to create an environment that 'would reasonably be perceived, and is perceived, as hostile or abusive.'"    *Schwapp,* 118 F.3d at 110 (quoting *Harris,* 510 U.S. at 22).    For example, although Mr. Ha, who did not supervise Plaintiff, allegedly refused to answer Plaintiff's questions, during this time another General Engineer, Mr. Vargas, acted as a mentor to Plaintiff, answering Plaintiff's

---

[14] Although Plaintiff does not address these claims in his Opposition Brief, Plaintiff previously raised denial of training and poor performance reviews as evidence of a hostile work environment and Defendant addresses these arguments in their motion for summary judgment. (*See* ECF No. 51, Def. Mot. at 29-32.) First, it is well settled in the Second Circuit that performance management and negative reviews are not evidence of a hostile work environment. *See Littlejohn v. City of New York*, 795 F.3d 297, 321 (2d Cir. 2015) (finding evidence that a supervisor "wrongfully reprimanded" Plaintiff, among other things, was not sufficient to establish a finding of hostile work environment).    Second, Plaintiff's claims premised on a denial of training are, as set forth above, untimely, and the undisputed facts demonstrate that Plaintiff did not submit the necessary documentation to receive a travel stipend to attend the Life Safety Code Training, the OSHA-30 training Plaintiff requested was not available to any employee at the time of Plaintiff's request, and Plaintiff received permission to use his paid time off to attend the New Jersey electrical license seminar, but the VA could not pay for it because it was not necessary to his job responsibilities. (Def. 56.1 Statement ¶¶ 118, 120, 125.)    Accordingly, even these incidents, taken together with Mr. Ha's comments, do not demonstrate a workplace "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Wiercinski v. Mangia 57, Inc.*, 787 F.3d 106, 113 (2d Cir. 2015) (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).

questions, assisting Plaintiff with his day-to-day responsibilities, and showing Plaintiff how to complete tasks. (Def. 56.1 Statement ¶ 99.)  Moreover, Mr. Vargas, who also identifies as African American, provided sworn testimony during Plaintiff's EEO proceeding that Mr. Vargas did not perceive "the office [to be] a hostile work environment to work in," noting that "if there was racial discrimination against [African Americans] it would be towards all of us not just one person."  (Def. 56.1 Statement ¶ 105.)

Considering the totality of these circumstances, Plaintiff's "allegations could not support a finding of hostile work environment that is so severe or pervasive as to have altered the conditions of [Plaintiff's] employment." *Littlejohn v. City of New York*, 795 F.3d 297, 321 (2d Cir. 2015) (citing *Fleming v. MaxMara USA, Inc.,* 371 F. App'x 115, 119 (2d Cir. 2010) (concluding that no hostile work environment existed even though "defendants wrongly excluded [the plaintiff] from meetings, excessively criticized her work, refused to answer work-related questions, arbitrarily imposed duties outside of her responsibilities, threw books, and sent rude emails to her"); *Davis-Molinia v. Port Auth. of N.Y. & N.J.,* No. 08-cv-7586 (GBD), 2011 WL 4000997, at *11 (S.D.N.Y., Aug. 19, 2011) (finding that "diminished [job] responsibilities," "exclu[sion] from staff meetings," deliberate "avoid[ance]," "yell[ing] and talk[ing] down to," and an increased

50

workload of menial tasks, among other factors, was not enough to show that defendants' conduct was sufficiently severe or pervasive), *aff'd,* 488 F. App'x 530 (2d Cir. 2012)). Moreover, Mr. Ha was "not [P]laintiff's supervisor, and there is no evidence that [he] had the ability to affect the terms of [P]laintiff's employment." *Perard v. Jamaica Hosp. Med. Center*, No. 18-cv-6661 (KAM)(RER), 2020 WL 5633153, at *16 (E.D.N.Y. Sept. 20, 2020).

Having considered the evidence before the court in the light most favorable to the non-moving party, and based on the totality of the circumstances, the Court finds that Plaintiff has not demonstrated a sufficiently hostile and pervasive environment. Accordingly, Defendant's motion for summary judgment on Plaintiff's hostile work environment claim is GRANTED.

## CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment as to all of Plaintiff's claims is GRANTED. Plaintiff's claims are dismissed with prejudice. The Clerk of Court is respectfully directed to enter judgment in favor of Defendant and close this case.

**So ordered.**

Dated:     September 11, 2025
           Brooklyn, New York

_____
**Kiyo A. Matsumoto**
United States District Judge
Eastern District of New York